UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JACKIE BERGER,

                    Plaintiff,

v.

                                                Case No. 3:17-cv-1191-J-34JBT

M.B. CARLTON
AND M.R. WILLIAMS,

                    Defendants.

_____

## ORDER

### I. Status

Plaintiff Jackie Berger, an inmate of the Florida penal system, initiated this action on October 24, 2017, by filing a pro se Civil Rights Complaint (Doc. 1). He filed an Amended Complaint (Doc. 5) on December 6, 2017, and a Second Amended Complaint (SAC; Doc. 27) on June 21, 2018. In the SAC, Berger asserts claims pursuant to 42 U.S.C. § 1983 against Defendants Captain M.B. Carlton and Sergeant M.R. Williams. He asserts that Defendants violated his Eighth Amendment right when they unjustly directed the use of chemical agents and denied him a timely decontamination shower on January 20, 2017, at Suwannee Correctional Institution Annex (SCIA). As relief, he requests compensatory and punitive damages.

This matter is before the Court on Defendants Carlton and Williams' Motion for Summary Judgment (Motion; Doc. 61). They submitted exhibits in support of the Motion. See Def. Exs., Docs. 61-1 through 61-11; S-68 (sealed videos).[1] The Court advised

_____

[1] The Court cites to the document and page numbers as assigned by the Court's Electronic Case Filing System.

Berger of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion to dismiss or a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and gave him an opportunity to respond to the Motion. See Order (Doc. 9); Summary Judgment Notice (Doc. 64). Berger filed a response in opposition to the Motion. See Memorandum in Opposition to Defendants' Motion for Summary Judgment (Response; Doc. 70) with exhibits (P. Exs., Docs. 70-1 through 70-4). The Motion is ripe for review.

## II. Plaintiff's Allegations[2]

In his verified SAC,[3] Berger asserts that, at approximately 7:00 to 7:30 a.m. on January 20, 2017, SCIA officers accused him of "causing, creating and inciting" a disturbance in P dormitory's quad two. SAC at 10. According to Berger, Defendant Williams, the dormitory's supervising sergeant, "allegedly" saw him "shouting obscenities" at staff, kicking his cell door, and "encouraging other inmates to break the sprinkler heads." Id. Berger states that Williams reported his alleged misconduct to Defendant Carlton. See id. He avers that when Carlton accused him of causing the disturbance, he and his cellmate (Latwain McLaren, #U26804) explained that they were not the ones who incited the disturbance. See id. According to Berger, Carlton heard other inmates (Allen

---

[2] The recited facts are drawn from the SAC.

[3] See Stallworth v. Tyson, 578 F. App'x 948, 950 (11th Cir. 2014) (citations omitted) ("The factual assertions that [Plaintiff] made in his amended complaint should have been given the same weight as an affidavit, because [Plaintiff] verified his complaint with an unsworn written declaration, made under penalty of perjury, and his complaint meets Rule 56's requirements for affidavits and sworn declarations.").

Willich #J39576 and Carlton Holliman #169976) kicking their doors and yelling, and therefore asked them about their involvement in the disturbance. See id. at 10-11. Berger states that Carlton ultimately discredited the inmates' accounts and relied on Williams' statement that Berger had shouted at staff and caused the disturbance. See id. at 11. Berger avers that Carlton authorized the chemical spraying at approximately 8:30 a.m., and that an unknown officer sprayed chemical agents in Berger's face, mouth, and eyes. See id. at 11-12. According to Berger, the officer "held the trigger of the canister longer than" the Florida Department of Corrections (FDOC) policy permits. Id. at 12. Additionally, he states that Carlton neither permitted McLaren and him to submit to handcuffs instead of being subjected to chemical agents nor allowed McLaren to exit the cell before the chemical spraying. See id. at 11.

Berger further maintains that Carlton and Williams left him handcuffed in his cell and denied him a decontamination shower for over ninety-five minutes. See id. at 12. According to Berger, as a result of the chemical spraying and delayed decontamination shower, he suffered injuries (partial blindness, blurred and deteriorating vision, dermatological issues, lung congestion, uncontrollable wheezing, shortness of breath, and constant coughing) that "led to months of medical attention." Id. at 12-13.

### III. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure (Rules(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include

3

"depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[4] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then

---

[4] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable.

4

go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Summary judgment is improper, however, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Guevara v. NCL (Bahamas) Ltd., 920 F.3d 710, 720 (11th Cir. 2019) (quotation marks and citation omitted).

## IV. Summary of the Arguments

In the Motion, Defendants Carlton and Williams request dismissal of Berger's claims against them because Berger failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act (PLRA), before filing the instant lawsuit. See Motion at 11-15. They also maintain that there are no genuine issues of material fact, and therefore, the Court should grant summary judgment in their favor as to Berger's Eighth Amendment claims against them. See id. at 15-21. Additionally, Defendants assert that they are entitled to qualified immunity. See id. at 21-26. Lastly, they maintain that Berger

is not entitled to compensatory and punitive damages under 42 U.S.C. § 1997e(e) because he has not alleged any physical injury resulting from Defendants' acts and/or omissions. See id. at 26-30. In his Response, Berger states that he submitted grievances that the FDOC failed to respond to, and therefore, he sufficiently exhausted his administrative remedies. See Response at 5-8. He also maintains that Defendants are not entitled to summary judgment in their favor because there remain genuine issues of material fact as to his Eighth Amendment claims against them. See id. at 4-5.

## V. Exhaustion of Administrative Remedies

### A. PLRA Exhaustion

The PLRA requires an inmate wishing to challenge prison conditions to exhaust all available administrative remedies before asserting any claim under 42 U.S.C. § 1983. See 42 U.S.C. § 1997e(a). Nevertheless, a prisoner such as Berger is not required to plead exhaustion. See Jones v. Bock, 549 U.S. 199, 216 (2007). Instead, the United States Supreme Court has recognized that "failure to exhaust is an affirmative defense under the PLRA[.]" Id. Importantly, exhaustion of available administrative remedies is "a precondition to an adjudication on the merits" and is mandatory under the PLRA. Bryant v. Rich, 530 F.3d 1368, 1374 (11th Cir. 2008). Not only is there a recognized exhaustion requirement, "the PLRA … requires proper exhaustion" as set forth in the applicable administrative rules and policies of the institution. Woodford v. Ngo, 548 U.S. 81, 93 (2006).

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency

6

> a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)."

Id. at 90 (citation omitted). Indeed, "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules[.]" Id.

In Ross v. Blake, the Supreme Court instructed that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement. The only limit to § 1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'" 136 S. Ct. 1850, 1862 (2016). For an administrative remedy to be available, the "remedy must be 'capable of use for the accomplishment of [its] purpose.'" Turner v. Burnside, 541 F.3d 1077, 1084 (11th Cir. 2008) (quoting Goebert v. Lee Cty., 510 F.3d 1312, 1322-23 (11th Cir. 2007)). In Ross, the Court identified three circumstances in which an administrative remedy would be considered "not available." Ross, 136 S. Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. Next, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Finally, a remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

The determination of whether an inmate exhausted his available administrative remedies prior to pursuing a cause of action in federal court is a matter of abatement and

should be raised in a motion to dismiss or be treated as such if raised in a summary judgment motion. <u>Bryant</u>, 530 F.3d at 1374-75 (citation omitted). Because failure to exhaust administrative remedies is an affirmative defense, the defendant bears "the burden of proving that the plaintiff has failed to exhaust his available administrative remedies." <u>Turner</u>, 541 F.3d at 1082. The Eleventh Circuit has articulated a two-step process that the Court must employ when examining the issue of exhaustion of administrative remedies.

> After a prisoner has exhausted the grievance procedures, he may file suit under § 1983. In response to a prisoner suit, defendants may bring a motion to dismiss and raise as a defense the prisoner's failure to exhaust these administrative remedies. <u>See</u> <u>Turner</u>, 541 F.3d at 1082. In <u>Turner v. Burnside</u> we established a two-step process for resolving motions to dismiss prisoner lawsuits for failure to exhaust. 541 F.3d at 1082. First, district courts look to the factual allegations in the motion to dismiss and those in the prisoner's response and accept the prisoner's view of the facts as true. The court should dismiss if the facts as stated by the prisoner show a failure to exhaust. <u>Id.</u> Second, if dismissal is not warranted on the prisoner's view of the facts, the court makes specific findings to resolve disputes of fact, and should dismiss if, based on those findings, defendants have shown a failure to exhaust. <u>Id.</u> at 1082-83; <u>see</u> <u>also</u> <u>id.</u> at 1082 (explaining that defendants bear the burden of showing a failure to exhaust).

<u>Whatley v. Warden, Ware State Prison</u>, 802 F.3d 1205, 1209 (11th Cir. 2015); <u>see</u> <u>Pavao v. Sims</u>, 679 F. App'x 819, 823-24 (11th Cir. 2017) (per curiam).

### B. Forfeiture of the Exhaustion Defense

Defendants Carlton and Williams maintain that Berger failed to exhaust his administrative remedies as to his Eighth Amendment claims against them. <u>See</u> Motion at 11-15. The Eleventh Circuit has stated that "under Federal Rule of Civil Procedure

8

12(g)(2),[5] a defendant must raise the exhaustion defense in his first Rule 12 motion, otherwise the defense is forfeited and cannot be raised in a later motion under Rule 12." Brooks v. Warden, 706 F. App'x 965, 968 (11th Cir. 2017) (footnote omitted). In the instant action, Defendants previously filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). See Defendants' Motion to Dismiss Plaintiff's Amended Complaint (MTD; Doc. 30). In their MTD, they maintained that they were entitled to qualified immunity. See MTD at 7-9. Additionally, they stated that Berger failed to state plausible Eighth Amendment claims against them, see id. at 6-7, and Carlton was not liable on the basis of respondeat superior, see id. at 9-10. Lastly, they stated that Berger was not entitled to compensatory and punitive damages under 42 U.S.C. § 1997e(e) because he had not alleged any physical injuries that were more than de minimis, resulting from Defendants' acts and/or omissions. See id. at 10-13. The Court granted Defendants' MTD to the extent that Berger sought to impose liability on Carlton based on the theory of respondeat superior, and therefore dismissed Berger's claims against Carlton on the basis of respondeat superior. See Order (Doc. 38) at 18, ¶ 1. Otherwise, the Court denied Defendants' MTD. See id.

Here, because Defendants failed to assert a failure-to-exhaust defense in their MTD, they are precluded from raising that defense in their motion for summary judgment. While Defendants have raised the defense in a motion for summary judgment under Rule

---

[5] Federal Rule of Civil Procedure 12(g)(2) provides: "Limitation on Further Motions. Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion."

56, rather than another Rule 12 motion, the Court must treat the motion as one seeking dismissal with regard to their assertion that Berger failed to exhaust his administrative remedies. See Bryant, 530 F.3d at 1374-75. Unfortunately for Defendants, Rule 12(g)(2) bars the untimely assertion of the exhaustion defense in this action. As such, Defendants have forfeited the exhaustion defense and cannot raise it in their motion for summary judgment. Defendants' Motion as to their failure-to-exhaust assertion is therefore due to be denied.

## VI. Law

### A. Excessive Use of Force

With respect to the appropriate analysis in an excessive use of force case, the Eleventh Circuit has explained.

> [O]ur core inquiry is "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992). In determining whether force was applied maliciously and sadistically, we look to five factors: "(1) the extent of injury; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates[, as reasonably perceived by the responsible officials on the basis of facts known to them]. . ." Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999) (quotations omitted).

McKinney v. Sheriff, 520 F. App'x 903, 905 (11th Cir. 2013) (per curiam). "When considering these factors, [courts] 'give a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the

scene of a disturbance.'" Fennell v. Gilstrap, 559 F.3d 1212, 1217 (11th Cir. 2009) (per curiam) (quoting Cockrell v. Sparks, 510 F.3d 1307, 1311 (11th Cir. 2007)).

"The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson v. McMillian, 503 U.S. 1, 9-10 (1992) (internal quotations and citations omitted). Indeed, not "every malevolent touch by a prison guard gives rise to a federal cause of action." Id. at 9 (citation omitted). Notably, a lack of serious injury is relevant to the inquiry. See Smith v. Sec'y, Dep't of Corr., 524 F. App'x 511, 513 (11th Cir. 2013) (per curiam) (quoting Wilkins v. Gaddy, 559 U.S. 34, 38 (2010) (per curiam)). The United States Supreme Court has explained:

> "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." Ibid.[6] (quoting Whitley,[7] supra, at 321, 106 S.Ct. 1078). The extent of injury may also provide some indication of the amount of force applied. . . . An inmate who complains of a "'push or shove'" that causes no discernible injury almost certainly fails to state a valid excessive force claim. Id., at 9 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).[8]
>
> Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability

---

[6] Hudson, 503 U.S. at 7.

[7] Whitley v. Albers, 475 U.S. 312 (1986).

[8] See Johnson, 481 F.2d at 1033 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.").

> to pursue an excessive force claim merely because he has
> the good fortune to escape without serious injury.

Wilkins, 559 U.S. at 37-38.

### B. Eighth Amendment Deliberate Indifference

The Eleventh Circuit has explained the requirements for an Eighth Amendment

violation with respect to prison conditions.

> "The Constitution does not mandate comfortable
> prisons, but neither does it permit inhumane ones ...." Farmer,
> 511 U.S. at 832, 114 S. Ct. at 1976 (internal quotation and
> citation omitted).[9] Thus, in its prohibition of "cruel and
> unusual punishments," the Eighth Amendment requires that
> prison officials provide humane conditions of confinement. Id.
> However, as noted above, only those conditions which
> objectively amount to an "extreme deprivation" violating
> contemporary standards of decency are subject to Eighth
> Amendment scrutiny. Hudson, 503 U.S. at 8-9, 112 S. Ct. at
> 1000. Furthermore, it is only a prison official's subjective
> deliberate indifference to the substantial risk of serious harm
> caused by such conditions that gives rise to an Eighth
> Amendment violation. Farmer, 511 U.S. at 828, 114 S. Ct. at
> 1974 (quotation and citation omitted); Wilson, 501 U.S. at 303,
> 111 S. Ct. at 2327.[10]

Thomas v. Bryant, 614 F.3d 1288, 1306-07 (11th Cir. 2010). The Eighth Amendment also

requires prison officials to "take reasonable measures to guarantee the safety of the

inmates." Farmer, 511 U.S. 832 (quoting Hudson v. Palmer, 468 U.S. 517, 526-27

(1984)). However, not every injury that a prisoner suffers as a result of a prison condition

necessarily equates to a constitutional violation. See Goodman v. Kimbrough, 718 F.3d

---

[9] Farmer v. Brennan, 511 U.S. 825 (1994).

[10] Wilson v. Seiter, 501 U.S. 294 (1991).

1325, 1333 (11th Cir. 2013). Only injuries that occur as a result of a prison official's deliberate indifference rise to the level of an Eighth Amendment violation. See Farmer, 511 U.S. at 834.

Recently, the Eleventh Circuit addressed the requirement of deliberate indifference to a substantial risk of harm as follows:

> To establish a § 1983 claim for deliberate indifference, a plaintiff must show "(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation."[11]
>
> **The first element** of deliberate indifference — whether there was a substantial risk of serious harm — is assessed objectively and requires the plaintiff to show "conditions that were extreme and posed an unreasonable risk of serious injury to his future health or safety."[12] **The second element** — whether the defendant was deliberately indifferent to that risk — has both a subjective and an objective component. Subjectively, the "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and ... also draw the inference."[13] Objectively, the official must have responded to the known risk in an unreasonable manner, in that he or she "knew of ways to reduce the harm" but knowingly or recklessly declined to act.[14] **Finally**, the plaintiff must show a "necessary causal

---

[11] Lane v. Philbin, 835 F.3d 1302, 1307 (11th Cir. 2016) (quoting Hale v. Tallapoosa Cty., 50 F.3d 1579, 1582 (11th Cir. 1995)).

[12] Lane, 835 F.3d at 1307.

[13] Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 617 (11th Cir. 2007) (quoting Farmer, 511 U.S. at 837).

[14] Rodriguez, 508 F.3d at 620 (quoting Hale, 50 F.3d 1583).

link" between the officer's failure to act reasonably and the plaintiff's injury.[15]

Marbury v. Warden, 936 F.3d 1227, 1233 (11th Cir. 2019) (per curiam) (emphasis added);

Johnson v. Bessemer, Ala., City of, 741 F. App'x 694, 698-99 (11th Cir. 2018) (per curiam).

The Eleventh Circuit has instructed:

> Proof of deliberate indifference requires a great deal more than does proof of negligence: "To be deliberately indifferent a prison official must know of and disregard 'an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Purcell, 400 F.3d at 1319-20 (emphasis supplied) (quoting Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979, 128 L.Ed.2d 811 (1994)).[16]
>
> In other words, a plaintiff in [Berger]'s position must show not only that there was a substantial risk of serious harm, but also that [Defendants] "subjectively knew of the substantial risk of serious harm and that [they] knowingly or recklessly disregarded that risk." Hale, 50 F.3d at 1583 (alteration omitted) (internal quotation marks omitted). Whether prison officials had the requisite awareness of the risk "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Farmer, 511 U.S. at 842, 114 S. Ct. at 1981 (citation omitted). At the same time, the deliberate indifference standard - and the subjective awareness required by it - is far more onerous than normal tort based standards of conduct sounding in negligence: "Merely negligent failure to protect an inmate from attack does not justify liability under [§] 1983." Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990) (per curiam).

---

15  Rodriguez, 508 F.3d at 622-23.

16  Purcell ex rel. Estate of Morgan v. Toombs Cty., Ga., 400 F.3d 1313 (11th Cir. 2005).

14

> And[,] needless to say, to defeat a motion for summary
> judgment, [a plaintiff] must adduce specific evidence from
> which a jury could reasonably find in his favor; "[t]he mere
> existence of a scintilla of evidence in support of [his] position
> will be insufficient." Anderson, 477 U.S. at 252, 106 S. Ct. at
> 2512.

Goodman, 718 F.3d at 1332 (emphasis deleted); Melton v. Abston, 841 F.3d 1207, 1223

(11th Cir. 2016) (per curiam) (stating that a plaintiff who claims deliberate indifference

must prove: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk;

(3) by conduct that is more than mere negligence"); Scott v. Miami Dade Cty., 657 F.

App'x 877, 883 (11th Cir. 2016) (stating that "a plaintiff must allege facts that would allow

a jury to conclude that: the defendant actually knew that the plaintiff faced a substantial

risk of serious harm" (subjective component), and "the defendant disregarded that known

risk by failing to respond to it in an objectively reasonable manner" (objective

component)).

### C. Qualified Immunity

The Eleventh Circuit has stated:

> The qualified-immunity defense reflects an effort to
> balance "the need to hold public officials accountable when
> they exercise power irresponsibly and the need to shield
> officials from harassment, distraction, and liability when they
> perform their duties reasonably." Pearson v. Callahan, 555
> U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The
> doctrine resolves this balance by protecting government
> officials engaged in discretionary functions and sued in their
> individual capacities unless they violate "clearly established
> federal statutory or constitutional rights of which a reasonable
> person would have known." Keating v. City of Miami, 598 F.3d
> 753, 762 (11th Cir. 2010) (quotation marks and brackets
> omitted).

15

As a result, qualified immunity shields from liability "all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002). But the doctrine's protections do not extend to one who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." Harlow v. Fitzgerald, 457 U.S. 800, 815, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (internal quotation marks and alteration omitted).

To invoke qualified immunity, a public official must first demonstrate that he was acting within the scope of his or her discretionary authority. Maddox v. Stephens, 727 F.3d 1109, 1120 (11th Cir. 2013). As we have explained the term "discretionary authority," it "include[s] all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994) (internal quotation marks omitted). Here, it is clear that Defendant Officers satisfied this requirement, as they engaged in all of the challenged actions while on duty as police officers conducting investigative and seizure functions.

Because Defendant Officers have established that they were acting within the scope of their discretionary authority, the burden shifts to [plaintiff] to demonstrate that qualified immunity is inappropriate. See id. To do that, [plaintiff] must show that, when viewed in the light most favorable to him, the facts demonstrate that Defendant Officers violated [plaintiff's] constitutional right and that that right was "clearly established ... in light of the specific context of the case, not as a broad general proposition[,]" at the time of Defendant officers' actions. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), overruled in part on other grounds by Pearson, 555 U.S. 223, 129 S.Ct. 808. We may decide these issues in either order, but, to survive a qualified immunity defense, [the plaintiff] must satisfy both showings. Maddox, 727 F.3d at 1120-21 (citation omitted).

Jones v. Fransen, 857 F.3d 843, 850-51 (11th Cir. 2017). The Court has instructed:

Because § 1983 "requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation," Zatler v. Wainwright, 802

16

> F.2d 397, 401 (11th Cir. 1986) (per curiam) (citation omitted), each defendant is entitled to an independent qualified immunity analysis as it relates to his or her actions and omissions. So[,] we must be careful to evaluate a given defendant's qualified immunity claim, considering only the actions and omissions in which that particular defendant engaged.

Alcocer v. Mills, 906 F.3d 944, 951 (11th Cir. 2018).

## VII. Analysis[17]

### A. Eighth Amendment

Berger asserts that Defendants Carlton and Williams violated his Eighth Amendment right when they directed the application of chemical agents and denied him a timely decontamination shower on January 20, 2017. Defendants Carlton and Williams assert that they are entitled to summary judgment as to Berger's Eighth Amendment claims against them. In support of their position, they submitted exhibits, see Docs. 61-1 through 61-11, including their own Declarations, see Declarations of Michael Carlton (Carlton Decl.), Doc. 61-3 at 1-4; Michael Williams (Williams Decl.), Doc. 61-4 at 1-2, as well as the Declarations of Dr. Kalem Santiago (Santiago Decl.), Doc. 61-5 at 1-3, Jennifer Butler, Doc. 61-10 at 1-2, and Ashley Stokes, Doc. 61-11 at 1-2. With the Court's permission, see Order (Doc. 67), Defendants filed two digital video discs under seal, see Defendants' Exhibits to Be Filed Under Seal (Doc. S-68); Def. Exs. F1, F2 (handheld video); G1, G2, G3 (fixed wing video). The video evidence captures what transpired on

---

[17] For purposes of summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the plaintiff. Thus, the facts described in the Court's analysis may differ from those that ultimately can be proved.

January 20, 2017, at 8:24 a.m. until Berger's decontamination shower and post-use-of-force medical examination that ended almost one hour later.

In a Declaration, Defendant Williams describes the circumstances leading up to the January 20th incident involving Berger. He states in pertinent part:

> My name is Michael Williams. I was employed by the Florida Department of Corrections (FDC) from October 17, 2008 through September 13, 2018. On January 20, 2017, I was assigned as P-Dormitory housing supervisor at Suwanee Correctional Institution Annex.
>
> At approximately 7:00-7:05 A.M., I approached cell P2[]109 which housed both Plaintiff and inmate Latwain McLaren at the time. I observed Plaintiff wa[]ving his arm, kicking the cell door, and shouting obscenities toward confinement staff. I ordered him to cease his disruptive actions. Plaintiff refused and instead attempted [to] incite additional inmates on the wing to kick on their cell doors and break the sprinkler heads. I again ordered Plaintiff to cease his disruptive behavior. Plaintiff continued shouting f[ro]m his cell and kicking his cell door.
>
> After counseling with Plaintiff at approximately 7:05 A.M., I reported the above behavior to Captain Michael Carlton. I then had no further involvement with Plaintiff related to this incident as I left the area.
>
> It is my understanding from a review of the use of force report log number 17-01438 that force in the form of chemical agents were used on Plaintiff at 8:32 A.M. As described below, I was no longer present at the time.
>
> I was not a witness to the use of force against Plaintiff and had no involvement in the aftermath including Plaintiff's decontamination shower. Had I been involved in or even present during the use of force or in the aftermath, I would have been listed on the Use of Force Report as a witness.
>
> I did not approve or order that any force be used on Plaintiff, and did not have the authority to approve or order

18

> that any force be used on Plaintiff pursuant to Rule 33-602.210, Florida Administrative Code.
>
> At 8:30 A.M., I wrote Plaintiff a disciplinary report for a violation of Rule 33-602.314(2-2), Florida Administrative Code, which prohibits Inciting Riots. At 9:00 A.M., I wrote Plaintiff a disciplinary report for a violation of Rule 33-602.314 (2[-]3), Florida Administrative Code, which prohibits Participating in a Disturbance. After writing and submitting the above disciplinary reports, I had no further involvement in their processing. I have since learned that they were both rejected due to technical errors. Nonetheless, the information contained in both statements of fact is true and correct as written.

Williams Decl. at 1-2 (enumeration omitted). Additionally, Defendant Carlton describes his role during the events that transpired on the morning of January 20th, stating in pertinent part:

> 1.     My name is Michael Carlton. I was employed by the Florida Department of Corrections (FDC) from 1989 through August of 2018. On January 20, 2017, I was a Captain at Suwannee Correctional Institution Annex assigned as B-Shift Officer in Charge.
>
> 2.     On the morning of January 20, 2017, I was called to Quad 2 of P Dormitory at Suwannee C.I. Annex and witnessed Plaintiff, inmate Jackie Berger, DC#M38196, engaging in the disorderly actions of yelling obscenities toward staff, kicking on his cell door in cell P2109, attempting to incite other inmates to be disorderly, and refusing to submit to hand restraints. Sergeant Williams and another officer informed me that they had attempted to counsel with Plaintiff to cease his disorderly behavior prior to notifying me. Additionally, Ms. Karen Cooke, Mental Health Specialist, attempted crisis intervention techniques to get Plaintiff to cease his disorderly behavior with negative results.[18] I also

---

[18] Crisis intervention techniques are "[m]ethods used to offer immediate, short-term help to individuals who experience an event that produces emotional, mental, physical, and behavioral distress or problems." Fla. Adm. Code. R. 33-602.210 (1)(c), "Use of Force."

attempted crisis intervention techniques for that purpose, also with negative results.

3.    As a result of Plaintiff's refusal to comply with orders to cease his disorderly behavior, I reviewed form DC6-50B, Risk Assessment for the Use of Chemical Agents, to determine whether Plaintiff had any medical condition that may be exaggerated by the use of chemical agents or would preclude the use of chemical agents on Plaintiff and none were noted. Registered Nurse S. Hancock was also consulted to ensure that Plaintiff had no such medical condition and confirmed that he did not.

4.    At approximately 7:43 A.M., Duty Warden Assistant James Taylor was notified and approved the use of chemical agents. Pursuant to Rule 33-602.210, Florida Administrative Code, I lacked authority to approve the organized use of chemical agents without said approval.

5.    At approximately 8:26 A.M., I gave Plaintiff a final verbal order, which was recorded on video, to cease his disorderly actions. In that final order, I instructed Plaintiff that I was giving a final order and that further failure to comply with orders to cease his disorderly behavior would result in the use of chemical agents. Just prior to giving that order, I was immediately to the left of Plaintiff's cell giving a lead-in statement on the hand-held video camera. As is common in such a situation when an inmate can hear the lead-in statement being made and can see that the hand-held camera is being used, Plaintiff began to act in such a way as to appear compliant for the video footage. At the time of the final order he was sitting on his bunk and appeared to be reading a book.

[]Upon receiving that final verbal order, Plaintiff stood and began to protest about allegations against other officers regarding an unrelated incident he alleged had occurred prior to that date. At that time, Plaintiff made no statement denying that he had previously engaged in the above disorderly behaviors that morning and made no statement alleging that the disorderly behaviors were conducted by any other inmate. At that time, I ordered Plaintiff to cease his behavior, instructed him that we would address his allegations at a later time, and ordered Plaintiff to sit on his bunk. He continued his complaints in what, in my experience, appeared to be an

attempt to incite similar behavior from other inmates on the wing. I again ordered Plaintiff to sit on his bunk at which point he complied with my order, ceased his behavior, and sat on his bunk. I then acknowledged to Plaintiff that he had complied with my orders and instructed him that if at any time he renewed his behavior that chemical agents would be used without further warning.

6.      At approximately 8:30 A.M., after the handheld video was ended and I began to leave the quad, I heard an inmate yelling further obscene comments. I turned around back into the quad at that time and was able to personally observe inmate Berger continue his disorderly behavior by continuing to yell on the wing. I approached Plaintiff's cell at which point he denied having done so. However, based on my personal observation of Plaintiff continuing his previous behavior, I ordered Sergeant Philip Mayo to retrieve a canister of chemical agents in preparation for the use of chemical agents to bring Plaintiff into compliance following his repeated failure to comply with orders.

7.      Upon return to Plaintiff's cell, Plaintiff attempted to defeat the effects of chemical agents first by pulling a shirt over his head, and then by using his state-issued mattress to block the cell door. I radioed for the cell door to be opened, and once it was opened, Sergeant Mayo and I pulled the mattress toward the floor such that Sergeant Mayo could administer chemical agents. Sergeant Mayo administered two half-second bursts followed by two one-second bursts of chemical agents directed at Plaintiff.[19] The use of force ended at 8:33 A.M. I did not personally use any force on Plaintiff.

8.      At approximately 8:43 A.M., I was called back to quad 2 to address a separate incident involving disorderly conduct by another inmate which resulted in a separate use of force against that inmate.

9.      At 8:52:38, within the 20-minute timeframe, myself and multiple other officers arrived at Plaintiff's cell to escort him for a decontamination shower. At that time, Plaintiff informed us that he would need his cane in order to be

---

[19]  See Def. Ex., Doc. 61-1 at 1, Report of Force Used.

escorted to the shower. I informed him that his cane would not be necessary as we would assist him during the escort, however, he insisted the cane was necessary and an officer was dispatched to retrieve it. In the meantime, both Plaintiff and his cellmate were each placed in hand restraints through the opening in the cell door in preparation for being escorted for each of them to receive a decontamination shower. At 8:55 A.M., Plaintiff's cellmate was removed from the cell and escorted to a decontamination shower while we awaited the arrival of Plaintiff's cane. Shortly thereafter, I myself left the quad to retrieve Plaintiff's cane to prevent any further delay. I returned to the quad with Plaintiff's cane at 8:56:46 A.M. and Plaintiff was successfully escorted to a decontamination shower at that time.

10.     During Plaintiff's decontamination shower, as a result of the separate incident involving another inmate mentioned in paragraph eight (8) above, Lieutenant Karen Melia took over the supervision of the aftermath of Plaintiff's use of force from the decontamination shower through his escort and examination in medical and ultimate placement in a new cell.

11.     At 9:20 A.M., I wrote Plaintiff a disciplinary report for a violation of Rule 33-602.314 (6-1), Florida Administrative Code, which prohibits [d]isobeying a verbal or written order – any order given to an inmate or inmates by a staff member or other authorized person. After writing and submitting the above disciplinary report, I had no further involvement in its processing. The information contained in the statement of fact of that disciplinary report is true and correct as written.

12.     The use of chemical agents was used as a means of last resort following Plaintiff's repeated refusal to comply. Due in part to the ventilation system in the dorm, the use of chemical agents in a confinement dorm often spreads such that multiple inmates and officers in the area feel the effects of the chemical agents. Accordingly, it is not used unless necessary to avoid inciting disorderly behavior in other inmates in the dorm such as what occurred following the use of force on Plaintiff. The force which was used on Plaintiff was the minimal amount of force necessary to maintain care, custody, and control over Plaintiff. I did not use force to abuse

> or otherwise harm Plaintiff, and the force was only utilized
> based on Plaintiff's behavior within my presence.

Carlton Decl. at 1-4.

To defeat the Motion, Berger is required to present evidence to show that there is a genuine issue for trial. In opposing Defendants' Motion, Berger asserts that genuine issues of material fact remain, thus precluding the entry of summary judgment in Defendants' favor. See Response at 1-2, 4-5. He submitted the following exhibits in support of his position: (1) Sworn Declaration under Penalty of Perjury Pursuant to 28 U.S.C. § 1746 and Fla. Stat. § 92.525 (Berger Decl.), Doc. 70-1 at 1-6; (2) Sworn Declaration of Latwain McLaren (McLaren Decl.), Doc. 70-1 at 7-9; (3) Sworn Affidavit of Allen Willich, Doc. 70-1 at 10; (4) Sworn Affidavit of Carlton Holliman (Holliman Aff.), Doc. 70-1 at 11; (5) Disciplinary Report for violation of Rule 33-601.314, infraction 2-3, Log No. 231-170165, Doc. 70-1 at 12; (6) Disciplinary Report for violation of Rule 33-601.314, infraction 2-2, Log No. 231-170170, Doc. 70-1 at 13; (7) Inmate Sick Call Requests, dated January 24, 2017, February 2, 2017, March 12, 2017, July 11, 2018, September 18, 2018, September 20, 2018, and November 3, 2018, Doc. 70-2 at 1-7; (8) medical records, Doc. 70-2 at 8-29; (9) Rule 33-602.210, Use of Force, Doc. 70-3 at 1-10; (10) Rule 33-208.002, Rules of Conduct, Doc. 70-3 at 11-16; and (11) Grievances, Doc. 70-4 at 1-6.

In his Declaration, Berger states in pertinent part:

> I now give the following statement as recollection of the events
> [that] had been refreshed after having had the opportunity to
> review and inspect for the first time surveillance video
> recordings and/or documents resulting from the institution['s]

(Suwannee C.I.) investigation of the incident (use of force) by the defendants.

On Jan. 20, 2017 at approx. 7:00 a.m.[-] 7:05 a.m. while housed at Suwannee C.I. Annex P-dormitory (P2109) confinement. Plaintiff who at all relevant times was an impaired/disabled prisoner suffering from lower legs and feet deformities who uses [an] authorized medical device (cane) for mobility purposes daily. See Ex. B-(11)(12)(13)(14)(15)[.]

Sgt. Williams allegedly observed Plaintiff causing and creating [a] disturbance i.e. shouting obscenities[,] kicking the cell door[,] inciting riots[,] and encouraging other inmates to break the sprinkler heads which was captured on Unit #2 surveillance video/audio recording systems.

Sgt. Williams stated in general to the entire unit due to the loud commotion of several inmates yelling/kicking "if I have to come back out here somebody anybody gone [sic] get gassed."

At approx. 7:30 a.m.[,] Sgt. Williams returned to Unit #2 because of the constant yelling/kicking. Sgt. Williams stood at the base of the stairs looking in the direction of my cell (P2109). Sgt. Williams stated very low manipulating the audio not to pick up the comments at my cell door, "why the f[-]ck you kicking my door causing disturbance."

Although confronted with direct knowledge of the source of the noise base[d] on Inmate Allen Willich #J39576 (P2108) stating "Serg that was me yelling/kicking cause I got medical emergency – chest pains." See Willich (Affidavit) Ex. A-(3). At that point[,] Sgt. Williams demonstrated specific desire to target my cell (P2109) while stating very low "Willich shut the hell up and get off my door[,] lay down[,] you don[']t have nothing to do with this." In unison[,] my cellmate Latwain McLaren #U26804 and myself stated "Serg that's not us causing the disturbance." See McLaren (Affidavit) Ex. A-(2). Plaintiff reiterates that at no time between (7:00 a.m.[-] 7:05 a.m.) as Sgt. Williams alleged in disciplinary reports (#231-170165 part. in disturbance […] #231-170170 inciting riots) was Plaintiff's cell door (P2109) being kicked nor Plaintiff's voice distinctly heard shouting obscenities toward staff which would've been seen on Unit #2 fixed wing cameras and

detected by Unit #2 audio device among the many inmates shouting/kicking. See Ex. 4- (5)(6)(1).

As a seasoned Dept. of Corrections employee Sgt. Williams knew how to manipulate the incapabilities of Unit #2 fixed wing cameras to accurately record the activity inside cell (P2109) and the whispers to go undetected by Unit #2 audio. Furthermore[,] Sgt. Williams['] acts of maliciousness imposed Plaintiff to conditions that denied the minimal measures of life's necessities when Sgt. Williams knew Plaintiff's impairment prevented committing the disruptive behavior. Yet made the conscious decision to coerce and falsify records and reports which violate Dept. of Corrections rules, policies and directives governing Sgt. Williams['] actions in accordance with Ch. 33.208.002 (6)(12)(19)[,] F.A.C.[,] Ch. 33.208.005 (20)(23)(24)(28)(39)[,] F.A.C.[,] and Ch. 33-208.002 (8)[,] F.A.C.[,] which was dismissed at the institutional level. See Informal Grievance #231-1702-0078 Ex. A-(1) and Ex. C-(2)(3).

At approx. 8:26 a.m.[,] Cpt. Carlton arrived to P-dormitory and spoke with Sgt. Williams in the front hallway of Unit #2. Thereafter[,] entered the unit and was immediately assaulted with loud shouting and kicking by several inmates. Cpt. Carlton arrived to Plaintiff's cell (P2109) with the coerced story given to him by Sgt. Williams when he stated "why ya[']ll kicking my door and threatening my officers." Before (McLaren) approached the door[,] he stated to me "Bruh let me do the talking cause they (Sgt. Williams/Capt. Carlton) allegedly got it out for you so whatever you say really don['] matter sh[-]t." See McLaren (Affidavit) Ex. A-(2). At which time we both vehemently denied causing the disturbance i.e. shouting/kicking.

Cpt. Carlton approached inmate Allen Willich['s] cell (P2108) and Carlton Holliman['s] cell (P2104) who we[re] shouting. Inmate Willich stated "Carlton[,] Carlton that was me yelling and kicking because Sgt. Williams repeatedly denied my mental health/medical emergency." See Willich (witness statement DC6-112C form) and (Affidavit) Ex. A-(3).

Cpt. Carlton approached cell (P2104) which houses inmate Carlton Holliman. Upon arrival[,] immediately got into a heated shouting match to which Cpt. Carlton stated[,] "Holliman you

can get what (Berger) about to get if you continue yelling and kicking my door."

On Jan. 20, 201[7] Cpt. Carlton authorized (use of force) on inmate Holliman for throwing feces, yelling and kicking the door[,] by using chemical agents then cell extraction. See Holliman (Affidavit) Ex. A-(4)[.]

Cpt. Carlton returned to [Berger's] cell (P2109) whispering to avoid audio detection "it doesn't matter whether Willich admit to sh[-]t. My officer (Sgt. Williams) said you (Plaintiff) the ones [sic] he saw shouting obscenities toward staff[,] kicking the cell door[,] and inciting disturbance on the unit[,] so you and Holliman [are] the ones I[']m going to gas period."

[A]t that very moment[,] myself and McLaren (cellmate) offered to submit to hand restraints (handcuffs) to show compliance with all orders. However[,] Cpt. Carlton refused to allow our voluntary submission to (handcuffs) by viciously whispering at the cell door[,] "ain[']t no cuff'en up. Ya[']ll better cover up, it's about to get real hot." In violation of Ch. 33-602.210 Policy. See Ex. C-(1).

Capt. Calton['s] refusal to allow (uninvolved) inmate (McLaren) to exi[]t the cell[,] which would've necessitated Plaintiff's submitting to handcuffs also and prevented the need for force violated Ch. 33-602.210 (use of force) policy. See Ex. C-(1).

After having the opportunity to review and/or inspect documents and video footage[,] Plaintiff is able to accurately identify the two unknown officers as being (Ofc. Richard Mott and Sgt. Philip Mayo).

Several minutes elapsed before Cpt. Carlton returned with Ofc. Mott [(camera operator)] and Sgt. Mayo [(chemical agent administrator)]. Cpt. Carlton activated the (handheld) camera issuing "final" verbal orders to cease disorderly behavior[] to which Plaintiff again stated on camera of not being the inmate causing or creating disturbance. Plaintiff replied "yes sir" to the order given by Cpt. Carlton to have a seat on the bunk. Plaintiff backed away from the door and returned to [his] assigned bunk. Cpt. Carlton deactivated the (handheld) camera proceeding to walk off Unit #2. Before he (Cpt.

Carlton) made it to the front exit[,] an inmate yelled "suck my d[-]ck cojonas." Cpt. Carlton immediately returned to my cell (P2109) stating while smiling "get the gas." Plaintiff again stated[,] "that was [not] me yelling."

Cpt. Carlton ordered cell (2109) open while simultaneously reaching into the cell wrestling the mattress away from Plaintiff that was used as a shield. The first three burst[s] hit Plaintiff directly in the face, eye[]s and mouth. The fourth burst flew over Plaintiff's head landing on the back of the cell. Plaintiff was instantly deprived of [his] ability to breath[e] for several painful minutes, rendered incapacitated, blind and entire body set aflame with burning sensation and excruciating pain. McLaren (cellmate) abandon[ed] the semi safety of his blanket to render aid by throwing water onto Plaintiff's face, eye[]s, down my throat and over Plaintiff's entire torso to attempt to bring about immediate relief[,] to no avail.

Upon information and belief[,] on 2-1-17 Warden Walker Clemmons of Suwannee Correctional Institution conducted review/investigation of all (use of force) incidents including the incident Sgt. Mayo participated in on Jan. 20, 2017. The following was noted. Sgt. Philip Mayo administered (4) one second burst[s] during application of chemical agents. Sgt. Mayo will be retrained in the use of chemical agents. Sgt. Mayo will also be required to read Ch. 33-602.210 (use of force) policy and sign acknowledgement. Only (3) one second burst[s] are allowed per (use of force) policy. See Ex. C-(1).

Cpt. Carlton[']s intentional disregard of relevant, reliable and competent information available to him with inmates['] (Willich/Holliman) voluntary admi[ss]ion[s] to being the inmates (shouting/kicking) and Plaintiff's physical impairment prevented the ability to kick the cell door. From these undisputed facts, an officer in [a] similar situation would have known that there was no need for the degree of force applied. Yet[,] Plaintiff was [a] target of cruel and unusual punishment after the final unlawful application of chemical agents was utilized on Plaintiff and McLaren (cellmate) due to the coerced allegations of Sgt. Williams[.] [T]he cell door was closed and secured. There[,] Plaintiff remained handcuffed, saturated with pepper spray, deprived clear air, lungs burning, incapacitated blind and in extreme physical pain for well over the allotted time frame per Ch. 33-602.210 (use of force)  to

27

be given [a] timely decontamination shower. Cpt. Carlton knowingly and willingly disregarded policy, rules and directives creating excessive risk to Plaintiff's health and safety when denied [a] timely decontamination shower was committed purposefully with the malicious and sadistic intentions to cause harm, pain and suffering which served no legitimate penological purpose other than the unnecessary and wanton infliction of pain.

Upon information and belief[,] on 2-1-17[,] Warden Walker Clemmons of Suwannee Correctional Institution conducted review/investigation of all use of force incident[s] including the incident involving Cpt. Carlton on 1-20-17. See Ex. C-(1). The following was noted. Cpt. Carlton failed to follow Chapter 33-602.210[,] which states all inmates exposed to chemical agents shall be ordered to shower in cool water and change inner and outer garments within 20 minutes from [the] last application of chemical agents unless there is a documentable emergency resulting in an extension of the time frame or unless the inmate refuses to participate in the decontamination process. Inmate Berger was placed in the decontamination shower 27 minutes after the final application[,] which is 7 minutes over the allotted 20 minutes time frame. See Ex. C-(1)[.] Cpt. Carlton will be remin[d]ed of the importance of following the (use of force) policy and that he should remain attentive at all times during a use of force incident.

As a result of the coerced allegations of causing and/or creating [a] disturbance i.e. (shouting[,] kicking[,] and inciting riots) by Sgt. Williams and Cpt. Carlton coupled with being intentionally denied [a] timely decontamination shower has contributed in Plaintiff sustaining long term irreparable harm, pain and suffering for which Plaintiff continues to receive medical treatment.

(a) uncontrol[l]able wheezing and shortness of breath that has worsen[ed] developing into (mild intermittent asthma) for which is currently being treated with bronchodilator therapy i.e. (Xop[e]nex and Alvesco) inhalers[.] See Ex. B-(1)-(30) (physician's orders/provider progress notes/medication administration records/order record[s] history/sick call requests).

28

> (b) blurred deteriorating vision that has worsen[ed] for which Plaintiff currently [is] being treated by signing consultation form on 9-26-18 and have repeatedly requested treatment after the incident. See Ex. B-(1)-(30) (sick call requests/problem list/staff referral/consultation form).

> (c) submitted several sick call [forms] repeatedly requesting treatment due to the burning, peeling, shedding and rashes on the skin caused by the intentionally [sic] denial of [a] timely decontamination shower. See Ex. B-(1)(30)[.]

Berger Decl. at 1-6.

According to Berger, inmates Willich, Holliman, and McLaren's accounts support his claim that Defendants made false accusations against him, and therefore, their actions relating to the use of chemical agents were neither reasonable nor justified. Inmates Willich and Holliman, who were housed in cells in close proximity to Berger, aver that Berger neither shouted obscenities nor kicked his cell door. See Willich Decl; Holliman Decl. In a Declaration, Inmate McLaren (Berger's cellmate) describes what transpired that morning:

> I was housed in cell P-2109 (confinement) at Suwannee C.I.-Annex with Jackie Berger #M38196. When at some point during the early morning of January 20, 2017[,] Srgt. Williams kicked our door accusing inmate Berger of yelling and kicking the door. If I had to guess[,] it was around 7:20-7:30 A.M. because it was count when he walked in the unit. Me and Berger was [sic] on our assigned bunks talking about females and told Srgt. Williams that was not us causing the disturbance. Srgt. Williams came back on the unit because yelling and kicking was still going on. Inmate Willich who was housed in cell P-2108 told Srgt. Williams that he was the one kicking because he declared a Medical Emergency over 30 minutes ago. Srgt. Williams told Inmate Willich to lay down[,] he ain[']t got nothing to do with this. He then put a DC6-229B form on our door, falsely accusing Berger of causing a disturbance. When Capt. Carlton came on the unit[,] yelling and kicking was still going on because Inmate Willich called

29

out to Capt. Carlton and said[,] "I[']ll kick this bitch down until I get my Mental Health Emergency." Capt. Carlton told Inmate Willich "he better lay the f-ck down before he gets gassed too." When he got to our cell[,] I told Inmate Berger "let me do the talking cause they already got it out for you so whatever you say don't mean nothing." Capt Carlton then asked us[,] "why we kicking his door and threatening his officers?" I inmate McLaren attempted to tell Capt. Carlton that was not us but was interrupted due to the continuous banging and yelling. Capt. Carlton said he'll be back. He then left to go talk to Inmate Holliman for awhile then came back to our cell. I told Capt. Carlton how could it be possible for us to kick the door when inmate Berger is an impaired inmate. Capt. Carlton then said "My officer said ya[']ll was [sic] the ones yelling and kicking so ya[']ll getting gassed." [E]nd of discussion. I asked Capt. Carlton to cuff us up because we ain[']t got nothing to do with it. He then replied[,] "ain[']t no cuffin up[,] ya[']ll better cover up because it[']s about to get real hot" then walked off. He came back 10-15 minutes later with a camera and gas. I hid under my blanket to avoid the chemicals because I got bad allergies. After maybe like 10 minutes[,] I heard inmate Berger say he couldn't breath[e] so I tried to throw some water in his face but the water was turned off in the cell sink so I put my towel in the toilet bowl and used that water to try an[d] wipe his face. Then[,] Capt. Carlton came back after another 20-30 minutes[,] cuffed me up and pulled me out [of] the cell and closed the door leaving Berger cuffed up in the cell still suffocating from the chemicals. Srgt. Williams and Capt. Carlton lied about the entire incident in violation of Chpt. 33-208.002(6)(12)(19) and Chpt. 33-208.003(28) when they coerced the story of inmate Berger yelling obscenities, kicking the cell door, an[d] inciting a riot[.] I was in the cell[.] I know what happened. This was cruel and unusual punishment and excessive use of force, leaving Berger in the cell handcuffed for over 20 minutes with chemical agents on him [i]n violation of 33-602.210.

McLaren Decl. at 7-8.

The Court first addresses Defendant Williams' involvement, or lack thereof, in the incidents that transpired on the morning of January 20, 2017. Williams asserts that he is entitled to summary judgment as to Berger's Eighth Amendment claims against him

because he was neither involved with the use of chemical agents nor the denial of a timely decontamination shower. See Motion at 15, 17-18, 24. The record reflects the following events relating to Williams and Berger that morning. Williams counseled Berger about his behavior at approximately 7:05 a.m., reported to Captain Carlton (a higher-ranking officer) that Berger was disorderly, and wrote two disciplinary reports that were "rejected for re-write[s] due to technical errors." P. Exs., Docs. 70-1 at 12-13, 70-4 at 1; Berger Decl. at 1-2; Williams Decl. The "re-write[s]" were not completed within the required timeframe, and therefore, the disciplinary reports were never re-issued. P. Ex., Doc. 70-4 at 1. Williams was neither a witness to the use of force nor a participant in the application of chemical agents or the delay of Berger's decontamination shower. See Williams Decl. at 1; Berger Decl.; Def. Ex., Doc. 61-1. He had left the dormitory, and had no further involvement with Berger.[20]

Additionally, Williams neither approved nor directed that force be used against Berger. See Williams Decl. at 2. As a dormitory housing supervisor, Williams was not authorized to approve or direct the use of force against an inmate. See id. Carlton explains Williams' role, stating in pertinent part:

> Sergeant Williams was not a witness to the use of force against Plaintiff and had no involvement in the use of force or the aftermath including Plaintiff's decontamination shower. Had he been involved in or even present during the use of force or in the aftermath, he would have been listed on the

---

[20] Sergeant Philip Mayo, Officer Richard Mott (the camera operator), Sergeant James Arkinson, Officer James Allen, Sergeant Philip Speer, Sergeant Norman Norris, Officer Anthony Callahan, and Lieutenant Karen Melia documented their involvement in Incident Reports. See Def. Ex., Doc. 61-1 at 6-21.

> Use of Force Report as a witness.[21] The use of force via the use of chemical agents on Plaintiff was not done as a result of Sergeant Williams' report of Plaintiff's disorderly conduct. If Plaintiff had ceased his disorderly conduct after my final order, regardless of any past behavior that morning, the use of force would not have occurred.

Carlton Decl. at 4, ¶ 13. The video evidence supports Defendants' account that Williams was neither a participant nor a witness to the events at issue, and that Carlton, on his own based on what he saw and heard, decided to direct the application of chemical agents on Berger. See Def. Exs. F2; G1. As such, Defendants' Motion is due to be granted as to Berger's Eighth Amendment claims (the use of chemical agents and denial of a timely decontamination shower) against Defendant Williams.

Next, the Court turns to Defendant Carlton's involvement in the application of chemical agents and denial of a timely decontamination shower. Carlton asserts that he is entitled to summary judgment as to Berger's Eighth Amendment claims against him because he did not use any force against Berger, approved a minimum amount of force necessary to bring Berger into compliance with lawful orders, and directed the use of chemical agents as a last resort when he saw Berger resume his disorderly behavior after the final warning had been given. See Motion at 18. Berger maintains that the video evidence "firmly" supports his version of the facts, Response at 1, and that there remain genuine issues of material fact that preclude summary judgment in Carlton's favor, see id. at 4-5.

---

21 See Def. Ex., Doc. 61-1 at 1-3.

Four days after the January 20th incident, Berger provided a statement as part of the use-of-force investigation. See Def. Ex., Doc. 61-1 at 22, Witness Statement, dated January 24, 2017. In his Statement, Berger recounts the incident, stating in pertinent part:

> On Friday, 1/20/17 I informed Capt[a]in Carlton of the continuous denial of what we, the inmate[s], should be entitled to according to Ch. 33 and ADA provisions for inmates because I am impaired and have be[en] den[ied] my cane without just reasons. **Capt[a]in Carlton accused me of being loud and disorderly on the wing because somebody told him to leave me alone. He came back to my cell to confront me. I told him I wasn't the one who said that. He still gassed me.** Capt[a]in Carlton never gave me a verbal order on camera to cease my disorderly conduct before the administration of chemical agents. I am under extreme duress due to continuous physical assaults by Officer[s] Grantham and Perez, verbal abuse by Officer Carlton[,] and 1st, 8th and 14th amendments by Suwannee C.I. Annex administration. The Warden of this particular institution encourages the type of behavior exhibited which violate[s] 33-208.002[,] rules of conduct. . . .

Berger Statement (emphasis added).

The video evidence is reliable, and provides a chronology of how the incidents unfolded. The handheld video footage shows Carlton at 8:25 a.m.,[22] reading from a clipboard, announcing that Berger had created a disturbance, and distractingly commenting, "find out who that is, and we will gas him too." See Def. Ex. F1. Carlton stated that he had issued a final verbal order to Berger, had used crisis intervention techniques with negative results, had reviewed the DC4-650B risk assessment for use of chemical agents form, had the Duty Warden's approval for the use of chemical agents,

---

[22] Upon Carlton's request, camera operator Richard Mott announced the time. See Def. Exs. F1; Doc. 61-1 at 8.

and had exhausted other measures. See id. Carlton explained that it was his intent to resolve the disruption by counseling Berger and using chemical agents only as a last resort. See id.

When Carlton approached Berger's cell front to give the final order, Berger was reading a book while sitting on his bunk. See id. Upon hearing Carlton at cell front, Berger put down the book and approached the cell door to voice his complaints relating to assaults and his medical needs. See id. Carlton directed Berger to sit on his bunk and be quiet and Berger complied. See id. Next, Carlton acknowledged that Berger had complied with his verbal commands. See id. However, he advised Berger that the final order to cease disruptive behavior had been given, and that if Berger resumed his disruptive behavior, the cameraman would reactivate the handheld camera, and chemical agents would be used without any additional warnings. See id. At 8:27 a.m., Carlton announced, "this concludes the incident," and proceeded to leave the dormitory quad. See id.

According to Carlton, Berger resumed his disruptive behavior when the cameraman turned off the handheld camera. In his Declaration, Carlton describes what transpired.

> At approximately 8:30 A.M., after the handheld video was ended and I began to leave the quad, I heard an inmate yelling further obscene comments. **I turned around back into the quad at that time and was able to personally observe inmate Berger continue his disorderly behavior by continuing to yell on the wing. I approached Plaintiff's cell at which point he denied having done so.** However, based on my personal observation of Plaintiff continuing his previous behavior, I ordered Sergeant Philip Mayo to retrieve a canister of chemical agents in preparation for the use of chemical agents to bring Plaintiff into compliance following his repeated failure to comply with orders.

34

Carlton Decl. at 2, ¶ 6 (emphasis added). The fixed wing video footage displays Carlton exiting through the quad's glass doors, and the audio captures inmates' voices with obscene shouting. See Def. Ex. G1. Carlton stopped, paused, turned around, and headed directly to Berger's cell where he exchanged words with Berger. See id. The fixed wing audio captures Carlton stating to Berger: "say it again." Id.; see also Def. Ex., Doc. 61-1, McLaren Witness Statement, dated January 24, 2017. According to Berger, he told Carlton that he was not the one who had yelled. See Berger Decl. at 2.

At approximately 8:30 a.m., the handheld video footage shows Carlton with a clipboard, stating that he had advised Berger that he had been given a final order, Berger had complied, but had resumed his disruptive behavior. See Def. Ex. F2. Next, Carlton directed Sergeant Mayo to retrieve a canister of chemical agents "to bring [Berger] into compliance following his repeated failure to comply with orders." Carlton Decl. at 1, ¶ 6; Def. Ex. G1. Upon notification that chemical agents would be used, Berger attempted to defeat the effects of the chemical agents by pulling his shirt over his head and using his mattress to block the cell door. See Berger Decl. at 4; Carlton Decl. at 2; Def. Ex. F2. McLaren avers that he followed Carlton's advice to "cover up," and therefore, reclined on his bunk with his blanket over his face and body. See McLaren Decl. at 8; Def. Ex., Doc. 61-1 at 23, McLaren Statement, dated January 24, 2017.

At 8:32 a.m., Sergeant Mayo sprayed chemical agents into the cell. See Def. Ex., Doc. 61-1 at 1, Report of Force Used; Berger Decl. at 3; Def. Ex. F2. Carlton neither applied chemical agents upon Berger nor used any other force against Berger that morning. See Def. Ex. F2. After the application of chemical agents, Berger washed his

face in the sink, as other inmates in the dormitory shouted obscenities. See id. McLaren drenched his own undershirt with water from the sink to help Berger wipe off the chemicals from his head and face.[23]  See id. As Berger awaited a decontamination shower and post-use-of-force medical examination, commotion continued throughout the dormitory, including a separate incident involving disorderly conduct by another inmate which resulted in a use of force against that inmate. See Carlton Decl.; Holliman Decl.; Def. Ex. F2. Berger reported shortness of breath and lightheadedness to the cameraman and asked to go to the medical clinic. See Def. Ex. F2.

The video evidence refutes Berger's assertions that Carlton directed Mayo to aim for Berger's face, eyes, and mouth,[24]  and that Carlton "wrestled" Berger to submission.[25] See Def. Ex. F2.[26] Carlton twice announced the progression of events in front of the handheld camera, and gave Berger a final warning. See id. When Carlton directed Mayo to use chemical agents upon Berger, they were both faced with Berger holding his mattress in front of the cell door, while McLaren reclined on his bunk and covered himself with his blanket. See id. Carlton moved the mattress, so Mayo could spray the chemical

---

[23] McLaren states that the water in the sink was turned off, see McLaren Decl. at 8, however, Berger and Defendants agree that the video evidence is reliable.

[24] See SAC at 12.

[25] See SAC at 12.

[26] See Shaw v. City of Selma, 884 F.3d 1093, 1098 (11th Cir. 2018) ("But in cases where a video in evidence 'obviously contradicts the nonmovant's version of the facts, we accept the video's depiction instead of the nonmovant's account,' and 'view the facts in the light depicted by the videotape.'" (alterations adopted) (citation omitted)).

agents. See id. By that time, Berger had stepped towards his bunk and away from the cell door. See id.

Given the evidence submitted by Defendant Carlton, the Court finds that Carlton has met his initial burden of showing, by reference to his Declaration and the video evidence, that he directed the application of chemical agents against Berger based on his "personal observations" that Berger had resumed his disorderly conduct even after he had been given a final verbal warning. Motion at 24. Thus, Berger is required to present evidence to show that there is a genuine issue for trial. In doing so, he has provided McLaren's Declaration as well as Holliman and Willich's Affidavits to show that Carlton targeted Berger and unjustly directed the application of chemical agents. While the video and audio footage provides a detailed chronology, it fails to capture which inmate yelled obscenities at Carlton. Given the differences in Berger's and Carlton's sworn recollections, there remain genuine issues of material fact as to whether Carlton appropriately directed the use of chemical agents or maliciously targeted Berger with an enforcement tactic (the application of chemical agents) that was excessive. As such, Defendants' Motion as to Berger's Eighth Amendment claim (relating to Carlton's directive for the application of chemical agents) against him is due to be denied.

Next, Berger asserts that Defendant Carlton denied him a timely decontamination shower. Carlton contends that Berger's decontamination shower was delayed because there was another disturbance on the wing which required additional security measures, and Berger insisted that he needed his cane for the escort to the shower. See Motion at 21. The video evidence refutes Berger's assertion in the SAC that Carlton left him in his

cell for ninety-five minutes prior to being given a decontamination shower.[27] See Def. Exs. F2; G1; G2. Berger has since retreated from that initial calculation. See Berger Decl. at 5 (stating that he "was placed in the decontamination shower 27 minutes after the final application[,] which is 7 minutes over the allotted 20 minute[] time frame.").

The video evidence captures the delay, see Def. Exs. F2; G1; G2, and Carlton acknowledges it. See Carlton Decl. at 3, ¶ 9. In an Incident Report, Carlton explained that Berger's "decontamination shower exceeded the 20 minute time frame by 7 minutes due [to] an additional disturbance on quad 2 and retrieving inmate Berger's cane." Def. Ex., Doc. 61-1 at 6, Incident Report, dated January 20, 2017. Additionally, the video evidence captures the events that delayed Berger's decontamination shower. At 8:52 a.m., Carlton, accompanied by other officers, appeared at Berger's cell and ordered both inmates to submit to handcuffing for escort to decontamination showers. See Def. Ex. F2. The handheld video footage shows that Berger asked for his cane to help him walk to the decontamination shower. See id. Carlton informed Berger that he did not need his cane because the escort officers would assist him. See id. Nevertheless, Berger insisted that he needed his cane. See id.; Carlton Decl. Therefore, Carlton dispatched an officer to retrieve Berger's cane. See id. In the meantime, officers placed Berger and McLaren in hand restraints through the cell door's flap, removed McLaren from the cell, and escorted McLaren to a decontamination shower at 8:55 a.m. See id. The officers waited for the arrival of Berger's cane. See id. Berger sat on the cell floor, and repeatedly asked for his cane. See Def. Ex. F2. Carlton "left the quad to retrieve [Berger]'s cane to prevent any

---

[27] See SAC at 12.

further delay." Carlton Decl. at 3, ¶ 9; see Def. Ex. G1. At approximately 8:56 a.m., Carlton returned to the dormitory quad with Berger's cane, see id., and the officers escorted Berger to a handicapped decontamination shower, see Def. Ex. F2. Berger started his decontamination shower at 8:59 a.m., and showered for seven minutes. See Def. Exs. F2; G2.

Given the evidence submitted by Defendant Carlton, the Court finds that he has met his initial burden of showing, by reference to his Declaration, the Incident Report, and video evidence, that Berger's decontamination shower was delayed for seven minutes due to another inmate incident that required security considerations as well as Berger's insistence that he needed his cane for the escort. Thus, Berger is required to present evidence to show that there is a genuine issue for trial. See Brennan v. Headley, 807 F. App'x 927, 934 (11th Cir. 2020) (per curiam) ("But to survive a summary judgment motion, [Berger] must point to the presence of disputed, material facts.") (citing Clark v. Coats & Clark, Inc., 929 F.2d 604, 607-08 (11th Cir. 1991)). This, Berger has not done. The parties agree that the video evidence captures the delay and the circumstances associated with the delay. Thus, if this case were to proceed to trial, Berger would have only his testimony to support his claims, and his testimony does not refute Defendant Carlton's evidence that the delay was reasonable, and that Carlton ultimately retrieved Berger's cane to minimize the delay. Nor has Berger provided specific facts or evidence suggesting there was a substantial risk of serious harm, and that Carlton knew of the substantial risk of serious harm and knowingly or recklessly disregarded that risk. See Scott, 657 F. App'x at 883. There remain no genuine issues of material fact as to Berger's Eighth Amendment

claim that Carlton denied him a timely decontamination shower. As such, Defendants'
Motion is due to be granted as to Berger's Eighth Amendment claim (relating to the denial
of a timely decontamination shower) against Defendant Carlton.

### B. Qualified Immunity

Defendants Carlton and Williams assert that they are entitled to qualified immunity
because they did not commit any federal statutory or constitutional violation. See Motion
at 22-26. Under the doctrine of qualified immunity, Defendants may claim they are entitled
to qualified immunity from monetary damages in their individual capacities. It is
undisputed that Defendants were engaged in discretionary functions during the events at
issue. To defeat qualified immunity with respect to these Defendants, Berger must show
both that Defendants committed a constitutional violation, and that the constitutional right
violated was clearly established. As the Eleventh Circuit has instructed, the Court must
"parse" the actions each Defendant undertook, and "address the evidence as it pertains
solely to him." Alcocer, 906 F.3d at 952.

Upon review, Defendant Williams is entitled to qualified immunity from monetary
damages in his individual capacity as to Berger's Eighth Amendment claims against him.
Additionally, Defendant Carlton is entitled to qualified immunity from monetary damages
in his individual capacity as to Berger's Eighth Amendment claim (relating to the denial of
a timely decontamination shower) against him. However, Defendant Carlton is not entitled
to qualified immunity as to Berger's Eighth Amendment claim relating to Carlton's

directive that force be used. As such, Defendants' Motion as to their assertion of qualified immunity is due to be granted in part and denied in part.

### C. Physical Injury Requirement
### 42 U.S.C. § 1997e(e)

Next, the Court turns to Defendant Carlton's assertion that Berger is not entitled to compensatory and punitive damages under 42 U.S.C. § 1997e(e) because he has not alleged any physical injuries that are more than de minimis, resulting from Defendant's acts and/or omissions. See Motion at 26-30. In support of his position, Defendant Carlton submitted the Declaration of Dr. Santiago, who states in pertinent part:

> 1.      My name is Dr. Kalem Santiago, and I am in the employment of the Florida Department of Corrections (FDC). I am a medical doctor and have been the Chief of Medical Service for the Florida Department of Corrections since September 2017. Prior to that, I was the medical director of Madison Correctional Institution from 2014 through 2017, and a primary care physician at San Cristobal Medical Center and Emergency Center from 2009 through 2014.

> .   .   .   .

> 8.      I have read the complaint in this case and am aware that the Plaintiff has alleged that he suffered various injuries due to a use of force that occurred on January 20, 2017.

> 9.      According to [the] patient's medical records provided to me for review, there is no evidence of Plaintiff's alleged injuries due to a use of force that occurred in [sic] January 20, 2017. There is no evidence on his medical record that during or after the use of force of January 20, 2017 the patient had [a] skin rash, chemical burns to [his] face and eyes, blurred and deteriorating vision, lung congestion requiring breathing treatment, uncontrollable wheezing, shortness of breath, continuous coughing, partial blindness, eye dryness, and sores on his skin. In addition, there is no

evidence of a dermatologist's recommendation, consult, or evaluation.

10.     On January 20, 2017[,] the patient was seen by medical for a Post Use of Force Exam. Per notes DC4-701C and DC4-708, both completed that day, the patient denied injury, his vital signs were normal, and no evidence of injury was noted.[28] Education was provided to not use soap for 24 hours, and rinse with water as needed.

11.     On January 24, 2017[,] the patient was seen by a nurse and he requested renewal of a diet pass, renewal of a medication for his "liver condition," and a front cuff pass.[29] The patient did not mention any injuries, symptoms, or any other complaints.

12.     On January 26, 2017[,] the patient was seen by the doctor due to a nurse referral for evaluation of the front cuff pass need and the special diet pass, that patient requested on January 24, 2017. At that visit[,] the patient didn't mention to the doctor any of the alleged injuries, nor any symptoms or complaints due to the use of force from January 20, 2017.

13.     On February 10, 2017, patient was seen by the doctor for a right inguinal hernia evaluation, but the patient didn't mention any symptom or injury from the use of force of January 20, 2017.[30]

14.     On May 26, 2017, and November 10, 2017, the patient was seen by the doctor for his Chronic Illness Clinics.[31] On both visits[,] the patient reported "I am doing well" and didn't complain or mention any of the alleged injuries from the use of force of January 20, 2017.

---

28  See Doc. 61-5 at 13-14, Emergency Room Record and FDOC Diagram of Injury.

29  See Doc. 61-5 at 7, Chronological Record of Health Care.

30  See Doc. 61-5 at 6.

31  See Docs. 61-5 at 52-53; 61-6 at 50-51.

15.     On May 28, 2018[,] the patient wrote a sick call requesting renewal of medications that were prescribed on July 6, 2017.[32] He stated that the medications helped with the pain and skin rashes from chemical burns to [the] face and neck area that started on January 20, 2017. This is the first time, sixteen months after the use of force of January 20, 2017, that according to his records, he reported skin issues related to the use of force of January 20, 2017. He also mentioned that a dermatology consult was pending, however[,] there is no evidence of such a consult.

16.     On June 23, 2018[,] the patient wrote a sick call [request] where he mentioned respiratory or breathing issues.[33] This was seventeen months after the use of force of January 20, 2017.

17.     On June 26, 2018, the patient was seen by a nurse to address the sick call [request] of June 23, 2018.[34] The patient complained of shortness of breath, however[,] his vital signs and physical exam w[ere] normal, and no treatment was required.

18.     On July 2, 2018, the patient was seen at medical by a nurse due to peeling skin on hands, feet, and left hip.[35] The nurse referred the patient to the doctor. The patient was seen by the doctor on July 13, 2018, and prescribed antifungal cream.[36]

19.     On August 13, 2018[,] he submitted another sick call [request] about skin burning, peeling and scaling, and for the first time he mentioned on the same sick call that his eyes

---

32 See Doc. 61-6 at 33.

33 See Doc. 61-6 at 14.

34 See Doc. 61-6 at 12-13.

35 See Doc. 61-6 at 7-8.

36 See Doc. 61-5 at 201.

were blurry and burn[ing].[37] He documented that these problems started on or about January 2017.

20. On August 14, 2018[,] the patient is seen by a nurse due to above sick call [request].[38] He reported skin rash on hands, the nurse documented peeling areas around joints on hand. There was no mention of rash on face or neck area. Tolnaftate cream and powder (antifungal treatment) was provided to the patient.

21. On September 26, 2018[,] the patient was seen for a vision exam.[39] Snellen Chart exam is completed by the nurse and the chart is referred to the doctor for an Optometrist consult. The consult is completed by the doctor on October 1, 2018.[40]

22. Overall, there is no evidence that the skin problems that the patient began to report in 2018 were related to the use of force of January 20, 2017. Notably, there was no respiratory or breathing abnormal findings on the exam by medical in 2018, and no evidence of vision problems related to a use of force of January 20, 2017.

Santiago Decl. at 1-3.

In Brooks v. Warden, 800 F.3d 1295 (11th Cir. 2015), the Eleventh Circuit Court of Appeals addressed the availability of compensatory and punitive damages as well as nominal damages in suits brought by prisoners under § 1983. The Eleventh Circuit stated:

[Plaintiff]'s claim, however, is further governed by the Prison Litigation Reform Act of 1995 [(PLRA)], Pub.L. No. 104–134, §§ 802–10, 110 Stat. 1321, 1366–77 (1996). The PLRA places substantial restrictions on the judicial relief that prisoners can seek, with the goal of "reduc[ing] the number of frivolous

---

[37] See Doc. 61-5 at 194.

[38] See Doc. 61-5 at 193.

[39] See Doc. 61-5 at 187.

[40] See Doc. 61-5 at 182.

44

cases filed by imprisoned plaintiffs, who have little to lose and excessive amounts of free time with which to pursue their complaints." Al–Amin v. Smith, 637 F.3d 1192, 1195 (11th Cir. 2011) (quoting Napier v. Preslicka, 314 F.3d 528, 531 (11th Cir. 2002)). The section of the Act at issue here, 42 U.S.C. § 1997e(e), reads this way:

> No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act....

> This Court has held that § 1997e(e) applies to all federal civil actions, including constitutional claims brought under § 1983. See Harris v. Garner (Harris II), 216 F.3d 970, 984–85 (11th Cir. 2000) (en banc)....

> In this case, [Plaintiff] did not allege any physical injury . . . . Nevertheless, he sought "compensatory . . . punitive, and nominal damages" from [Defendant]. **Under the statute and our caselaw, an incarcerated plaintiff cannot recover either compensatory or punitive damages for constitutional violations unless he can demonstrate a (more than de minimis) physical injury.** See Al–Amin, 637 F.3d at 1198 (punitive); Harris v. Garner (Harris I), 190 F.3d 1279, 1286 (11th Cir. 1999) (compensatory), reh'g en banc granted and opinion vacated, 197 F.3d 1059 (11th Cir. 1999), opinion reinstated in relevant part, 216 F.3d 970. However, we have never had the opportunity in a published opinion to settle the availability of nominal damages under the PLRA. We do today, and we hold that nothing in § 1997e(e) prevents a prisoner from recovering nominal damages for a constitutional violation without a showing of physical injury.

Brooks, 800 F.3d at 1307-08 (emphasis added).

To satisfy § 1997e(e), a prisoner must assert physical injury that is more than de minimis, but the injury does not need to be significant. See Thompson v. Sec'y, Fla. Dep't of Corr., 551 F. App'x 555, 557 (11th Cir. 2014) (citation omitted); Dixon v. Toole, 225 F.

App'x 797, 799 (11th Cir. 2007). Despite § 1997e(e)'s limitation, successful constitutional claimants who lack a physical injury may still recover nominal damages. See Hughes v. Lott, 350 F.3d 1157, 1162 (11th Cir. 2003) ("Nominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages."). Further, the Eleventh Circuit has instructed courts to dismiss an inmate's compensatory and punitive damages claims under § 1997e(e) without prejudice to allow an inmate to refile when and if the inmate is released. See Harris v. Garner, 216 F.3d 970, 980 (11th Cir. 2000).

Here, Berger asserts physical injuries that are greater than de minimis. The injuries Berger complains about are allegedly the result of Defendant Carlton's authorizing and/or directing the chemical spraying. According to Berger, he suffered partial blindness, dermatological issues, and respiratory difficulties that required several months of medical treatment, as a result of the chemical spraying and delayed decontamination shower. See SAC at 9, 12-13. The video evidence shows Berger suffering the effects of the chemical agents and captures Berger complaining of shortness of breath and lightheadedness after the chemical spraying. See Def. Ex. F2. Defendant argues that Berger did not complain of any injury related to the January 20, 2017 incident to the medical department until May 28, 2018. See Motion at 30 (citing Santiago Decl. at 2, ¶ 15). However, the record reflects that Berger complained of injuries related to the January 20th application of chemical agents in sick call requests, as early as January 24, February 2, and March 12, 2017. See P. Ex., Doc. 70-2 at 1-3; see also Def. Ex., Doc. 61-5 at 41-42.

Berger's alleged injuries, described as dermatological, vision, and respiratory distress leading to months of medical treatment, cross § 1997e(e)'s de minimis threshold. See Thompson, 551 F. App'x at 557 n.3 (describing an approach of asking whether the injury would require a free world person to visit an emergency room or doctor) (citing Luong v. Hatt, 979 F. Supp. 481, 486 (N.D. Tex. 1997) ("A physical injury is an observable or diagnosable medical condition requiring treatment by a medical care professional. It is not a sore muscle, an aching back, a scratch, an abrasion, a bruise, etc., which lasts even up to two or three weeks.")). Thus, the Motion is due to be denied to the extent that the Court finds Berger's request for compensatory and punitive damages is not precluded under § 1997e(e) because he alleges that he suffered physical injuries that are greater than de minimis.

In consideration of the foregoing, it is now

**ORDERED**:

1.      Defendants Carlton and Williams' Motion for Summary Judgment (Doc. 61) is **GRANTED** as to (1) Berger's Eighth Amendment claims against Defendant Williams; (2) Defendant Williams' assertion of qualified immunity as to Berger's Eighth Amendment claims against him; (3) Berger's Eighth Amendment claim relating to the denial of a timely decontamination shower against Defendant Carlton; and (4) Defendant Carlton's assertion of qualified immunity as to Berger's Eighth Amendment claim relating to the denial of a timely decontamination shower against him. Otherwise, the Motion is **DENIED**.

2.      The Clerk shall enter judgment in favor of Defendant Michael Williams and make the appropriate notation on the docket.

3.     The parties must confer in good faith to discuss the issues and the possibility of settlement as to Berger's remaining Eighth Amendment claim against Defendant Carlton. **No later than August 5, 2020**, the parties must notify the Court whether they are able to reach a settlement. If the parties are unable to settle the case privately among themselves, they must notify the Court if they wish to have the case referred to a United States Magistrate Judge for a settlement conference. Otherwise, the Court will enter a case management order, set a trial date, and direct the parties to begin trial preparations.

**DONE AND ORDERED** at Jacksonville, Florida, this 6th day of July, 2020.

MARCIA MORALES HOWARD
United States District Judge

sc 6/18
c:
Jackie Berger, FDOC #M38196
Counsel of Record